UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------
:
AMBER HUMPHREY, :
*on behalf of herself and the class*, :
: CASE NO. 1:18-CV-1050
Plaintiff, :
:
vs. : OPINION & ORDER
: [Resolving Docs. 44, 51]
STORED VALUE CARDS, D/B/A NUMI :
FINANCIAL, *et al*. :
:
Defendants. :
:
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Amber Humphrey sues Defendants Stored Bank Cards, doing business as Numi Financial ("Numi"), and Republic Bank & Trust Company ("Republic"). With their complaint, Plaintiffs claim that Defendants violated the Electronic Funds Transfer Act ("EFTA") when the Defendants issued unsolicited debit cards. Plaintiffs say these unsolicited cards then charged fees that Plaintiffs had not agreed to. They allege that this unsolicited card issuance and Defendants' related fees violated EFTA and Ohio law. Defendants move to dismiss the complaint for failure to state a claim[1] and move for summary judgment.[2]

For the following reasons, the Court **DENIES** Defendants' motion to dismiss and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.

---

[1] Doc. 44. Plaintiffs oppose. Doc. 48. Defendants reply. Doc. 52. The legal arguments presented in this motion are largely the same as those in their motion for summary judgment.
[2] Doc. 51. Plaintiffs oppose. Doc. 53. Defendants reply. Doc. 54. Plaintiffs surreply. Doc. 58.

## I. Background

### A. Plaintiff Humphrey

In August 2017, Plaintiff Humphrey served a thirty-day drug paraphernalia possession sentence at the Lorain County Jail.[3] When she entered the jail, she had sixty dollars cash.[4] The jail took this money and placed Humphrey's money in an inmate trust account. During her incarceration, Humphrey used some of her inmate trust money to purchase food and hygiene items at the commissary.[5]

When Humphrey was released in September 2017, the jail gave Humphrey an already validated[6] prepaid debit card with the inmate trust account balance.[7] The card carried the Numi brand name and Humphrey's funds were put in a Republic bank account.[8]

At her deposition, Plaintiff testified that no one provided her with paperwork stating the card's terms and conditions.[9]

Plaintiff Humphrey states that she used the card for purchases and then used it to withdraw cash from an ATM.[10]

---

[3] Doc. 51-3 at 30 (Humphrey Dep.). Plaintiff was initially diverted into an intensive outpatient substance abuse program, in lieu of a jail sentence. She states that she decided to finish the program because the logistical burdens of the program were too heavy in light of her discovery, in May 2018, that she was pregnant. *Id.* at 31-32.
[4] *Id.* at 37.
[5] *Id.*
[6] A "validated" card is one that can be used immediately to initiate an electronic funds transfer. *See* 15 U.S.C. § 1693i.
[7] *Id.* at 50.
[8] Doc. 51-17 at 3.
[9] Doc. 51-3 at 55.
[10] *Id.* at 71.

### B. Defendants' Prepaid Card Program

Defendant Republic Bank sponsored the prepaid card program. Republic oversees the program, sets the terms of service, and holds and controls the cardholder funds.[11] Defendant Numi manages the card program by servicing the cards and markets the program to correctional institutions.

Republic keeps Cardholder funds in a "pooled" operating account.[12] That is, each prepaid card is not connected to an individual account. Instead, a single bank account holds funds for thousands of released inmates.[13] Individual card expenditures are tracked in a sub-ledger.[14]

The prepaid cards charge high fees for taking certain actions. For example, there is a $2.95 fee for using an ATM, and a $1.50 fee for performing an ATM balance inquiry.[15] The cards also impose fees for inaction; if there is money remaining on the card five days after issuance, Republic charges a $5.95 monthly maintenance fee for sitting on the account holder's monies.[16] A cardholder can request a paper check for the account balance at no charge but only if the request is made within the five days the card is issued.[17]

Defendant Numi contracts with correctional facilities to distribute prepaid cards to inmates. These Numi correctional facility contracts include provisions requiring the jails provide cardholder terms when jails give the cards to inmates when the inmates are

---

[11] Doc. 51-17 at 2 (Nelson Decl.).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] Doc. 51-13 (Cardholder agreement).
[16] *Id.*
[17] *Id.* After this five-day grace period, a check costs $9.95.

released.[18] Officer Frank Machovina, a Lorain County Jail correctional officer who gave the prepaid cards to released inmates, states that while he does not recall Ms. Humphrey's case in particular, he usually gives the card terms and conditions to each inmate.[19]

## II. Discussion

### A. Legal Standard

Summary judgment is proper where the moving party has "show[n] that there is no genuine dispute as to any material fact and that [they are] entitled to judgment as a matter of law."[20] Where the nonmoving party bears the burden of proof at trial, Rule 56 requires plaintiffs "to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"[21] Summary judgment is appropriate where the moving party "point[s] out to the district court" that "there is an absence of evidence to support the nonmoving party's case."[22]

### B. The Court Grants in Part and Denies in Part Defendants' Motion for Summary Judgment on Plaintiffs' EFTA Claim

Plaintiffs allege that the inmate prepaid debit card program violates two EFTA provisions: 15 U.S.C. § 1693i, which prohibits the unauthorized issuance of debit cards, and 15 U.S.C. § 1693l-1, which prohibits general-use prepaid card service fees. The Court addresses each claim in turn.

---

[18] Doc. 51-12 at 7.
[19] Doc. 51-19.
[20] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56).
[21] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)).
[22] *Id.* at 325.

Case No. 1:18-cv-1050
Gwin, J.

i. Unauthorized Issuance

Plaintiffs bring claims under 15 U.S.C. § 1693i. That provides that

> [N]o person may issue to a consumer any card, code, or other means of access to such consumer's account for the purpose of initiating an electronic fund transfer other than-- (1) in response to a request or application therefor; or (2) as a renewal of, or in substitution for, an accepted card, code, or other means of access, whether issued by the initial issuer or a successor.[23]

This provision stops the issuance of unsolicited but activated debit cards.

Defendants generally argue that its debit cards are not subject to EFTA's prohibition against the issuance of unsolicited debit cards. Defendant contend that because inmate funds were kept in a pooled account that EFTA does not apply to its card issuance.

EFTA defines "account" as "a demand deposit, savings deposit, or other asset account . . . as described in regulations of the Bureau, established primarily for personal, family, or household purposes."[24] The accompanying regulation, defines "account" as "a demand deposit (checking), savings, or other *consumer* asset account (other than an occasional or incidental credit balance in a credit plan) held directly or indirectly by a financial institution and established primarily for personal, family, or household purposes."[25]

With their motions, Defendants argue that the pooled custodial account used for the Plaintiffs' cards is not a "consumer asset account" as defined in the regulation. They offer two arguments in favor of this view, one textual and one historical.

---

[23] 15 U.S.C. § 1693i(a). Defendants do not argue that they are eligible for the 1693i(b) statutory exception.
[24] 15 U.S.C. § 1693a.
[25] 12 C.F.R. § 1005.2 (emphasis added).

5

Defendants' textual argument is that an "other consumer asset account" must be an account that is kept for the benefit of a *single* consumer. Apparently, Defendant reason that "consumer" can only be one individual. Because Plaintiffs' funds were held in a pooled account shared by many inmate cardholders, Defendants contend that the regulation does not apply.

There is simply no textual basis to narrow the regulatory definition this way.[26] The adjectival function of the term "consumer" means to limit the account to accounts used for personal, rather than business, purposes.[27] The Court is unaware of any dictionary defining the term "consumer" to mean that the account must be held one held by a single individual rather than a number of persons.

Further, Defendants' reading is inconsistent with the *ejusdem generis* canon of statutory interpretation. The term "consumer" appears as a generic term in a series describing asset account types: "demand deposit (checking), savings, or other consumer asset account." When general terms follow specific ones in such a series, the canon dictates that "the general terms are construed to embrace only objects similar in nature to the objects enumerated by the preceding specific words."[28]

Defendants' interpretation violates the canon because the first two terms in the series—checking and savings—are accounts that can be held jointly. Defendants'

---

[26] The court accepts, for the sake of argument, that the regulation's narrowing of the definition from the statute's "other asset account" to "other *consumer* asset account" is consistent with the statute.
[27] *Cf. Consumer Product*, Black's Law Dictionary (8th ed. 2004) ("An item of personal property . . . used for personal, family, or consumer purposes."); *Consumer Transaction*, Black's Law Dictionary (8th ed. 2004) ("A bargain or deal in which a party acquires property or services primarily for a personal, family or household purpose.").
[28] *Circuit City Stores Inc., v. Adams*, 532 U.S. 105, 114-15 (2001).

Case No. 1:18-cv-1050
Gwin, J.

interpretation, which would only include individual accounts, makes the general term *unlike* the terms it follows. Thus, Defendants' textual argument fails.

Defendants' historical argument turns on the Consumer Financial Protection Bureau's ("CFPB") 2016 amendments to Regulation E, EFTA's implementing regulations. These regulations, that will become effective April 1, 2019, add a section to 12 C.F.R. § 1005.2(b) separately defining "prepaid account." Defendants contend that this amendment would be unnecessary if prepaid accounts already fell under the regulation. Further, Defendants point out that in 2006, regulators considered (and ultimately declined to implement) an amendment that would have specifically covered prepaid card accounts.

This argument is also unpersuasive. That the CFPB chose to single out prepaid accounts for additional regulation does not mean that they were not covered by prior regulation or statute. On the contrary, the CFPB *based* its 2016 amendments on EFTA's broad statutory definition of "account." In the Federal Register entry discussing the 2016 rule, the Board noted that "insofar as the statute defines account broadly to include *any other asset account* . . . the Bureau believes it is reasonable to include 'account' in EFTA to include prepaid accounts."[29]

Additionally, the CFPB explained that its 2006 decision not to issue prepaid-card-specific regulations was because it was "premature" to regulate the cards. It explained that "in its view [in 2006] consumers did not often use prepaid cards in the same way that they used payroll cards."[30] The subsequent growth of prepaid cards led to the expansion of the

---

[29] *Prepaid Accounts Under the Electronic Fund Transfer Act (Regulation E) and the Truth in Lending Act (Regulation Z)*, 79 Fed. Reg 426, 77127 (Dec. 23, 2014) (emphasis added).
[30] *Id.* The 2006 rulemaking did promulgate specific rules covering payroll cards.

7

regulation in 2016. This decision was not, as Defendants contend, premised on the view that prepaid cards fell outside of the regulatory or statutory definition of "account."

Thus, the Court denies Defendants' motion for summary judgment on Plaintiffs' § 1693i claim.

ii. The Inmate Prepaid Card Is Not a "General-Use Prepaid Card"

Defendants also move for summary judgment on Plaintiffs' EFTA claim under 15 U.S.C. § 1693l-1, which prohibits the imposition of "service fees" on general-use prepaid cards.

Defendants argue that the prepaid cards are not covered by this statute and regulation because the statute excludes cards that are "not marketed to the general public."[31] The CFPB's official interpretation of this provision states that a card "is marketed to the general public if [it] is directly or indirectly offered, advertised, or otherwise promoted to the general public."[32] Plaintiffs counter that the exception does not apply because they are members of the general public.

Here, Defendants are correct. While Plaintiffs are now members of the public, there is no record evidence suggesting that the card was ever directly or indirectly "offered advertised, or otherwise promoted" *to them*. Indeed, given that the Plaintiffs had no choice but to receive the cards, marketing would serve no purpose.[33] Defendant Numi does perform marketing for the program, but it is *program* marketing (not card marketing) to

---

[31] 15 U.S.C. § 1693l-1(a)(2)(D)(iv); 12 C.F.R. § 1005.20(b)(4).
[32] *Consumer Financial Protection Bureau's Official Staff Commentary on Regulation E*, FRRS 6-5480.74, 2012 WL 2563634, at *9.
[33] The Court notes that the informational materials to be provided to inmates upon receipt of their cards promote an upgraded "personalized and reloadable" card with additional benefits. However, this upgraded card seems to be different from the card actually issued on release. *See* Doc. 51-5 at 3.

Case No. 1:18-cv-1050
Gwin, J.

correctional institutions.[34] Thus, the Court grants Defendants' motion for summary judgment on Plaintiffs' § 1693l-1 claim.

## C. Defendant is Not Entitled to Summary Judgment on Plaintiffs' Ohio Law Claims

Plaintiffs bring Ohio state law unjust enrichment and conversion claims. Plaintiffs may recover for unjust enrichment if they 1) conferred a benefit upon the Defendants; 2) Defendants knew of that benefit; and 3) the Defendants retained that benefit under circumstances where it would be unjust to do so without payment.[35] To prevail on a claim for conversion, Plaintiffs must show "(1) plaintiff's ownership or right to possession of the property at the time of conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages."[36]

i. Unjust Enrichment

Defendants argue that they should receive summary judgment on Plaintiffs' unjust enrichment claim because the Plaintiffs' fees came from a lawful contract between Defendant Numi and Lorain County. Defendants cite to *Mickelson v. Cty. of Ramsey*, where a district court dismissed similar claims under Minnesota law on these grounds.[37]

The Court is not persuaded that the ostensibly lawful contract between Numi and Lorain County, standing alone, justifies the Defendants' retention of fees. If, as Plaintiffs allege, the unsolicited issuance of the cards violated federal law, then the whole prepaid

---

[34] Doc. 51-11 at 7.
[35] *Stratmar Retail Servs., Inc. v. Firstenergy Serv. Co.*, No. 5:14CV780, 2015 WL 5662534, at *9 (N.D. Ohio Sept. 24, 2015)
[36] *Dream Makers v. Marshek*, 8th Dist. Cuyahoga No. 81249, 2002-Ohio-7069, 2002 WL 31839190, ¶ 19.
[37] No. 13-CV-2911, 2014 WL 4232284, at *15 (D. Minn. Aug. 26, 2014) (dismissing claim that fee imposition amounted to unjust enrichment because "[p]ursuant to [the bank's] agreement with Ramsey County, assessment of debit card fees . . . was legally authorized"), *aff'd*, 823 F.3d 918 (8th Cir. 2016).

9

card program—including the retention of fees—was unlawful notwithstanding the existence of an otherwise valid contract between Defendant Numi and the Lorain County Jail. Further, the legality of the contract between Numi and the Lorain Jail does not necessarily dictate that the involuntary imposition of fees on *third parties* is justified.[38]

Defendants also argue that Plaintiffs cannot recover fees under a theory of unjust enrichment because there was a binding contract between them and the Plaintiffs.[39] Defendants contend that Plaintiffs entered into a contract, regardless of whether they received the card terms and conditions at issuance. Defendants say that Plaintiffs card use to withdraw their money should be found to be an acceptance of the card's terms and conditions.

In support of this argument, Defendants cite to *Heiges v. JP Morgan Chase Bank, N.A.*, in which a district court found that the plaintiff had entered into a binding arbitration agreement with the bank by using a credit card, even though the bank could not produce a signed cardholder agreement.[40] In that case, however, the plaintiff had personally and affirmatively opened the credit card account at issue, giving rise to the presumption that there had been a "meeting of the minds" as to card terms and conditions.[41]

---

[38] A district court in Oregon reached the same conclusion regarding Oregon common-law unjust enrichment claims involving a nearly-identical inmate prepaid program. *See Brown v. Stored Value Cards, Inc.*, No. 3:15-CV-01370, 2016 WL 4491836, at *5 (D. Or. Aug. 25, 2016) ("Certainly, that the government authorized Defendants to act is at least *some* evidence that some people in society would find Defendants' retention of fees acceptable, but it hardly seems to be the *per se* ban on an unjust enrichment claim that Defendants propose.").

[39] *See R.J. Wildner Contracting Co. v. Ohio Tpk. Comm'n*, 913 F. Supp. 1031, 1043 (N.D. Ohio 1996) (recovery for unjust enrichment prohibited where express contract covers same subject).

[40] *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641, 647 (N.D. Ohio 2007) ("Accordingly, [Plaintiffs'] argument that he never signed the underlying Agreement misses the relevant point. By simply using the card, he agreed to be bound by the Agreement and all its terms.").

[41] The same is true for *Karmolinski v. Equifax Info. Servs., LLC*, No. CIV. 04-1448-AA, 2005 WL 7213289, at *2 (D. Or. Oct. 31, 2005), another case cited by the defendants. There, the Plaintiff had sent the bank a signed credit card application.

Here, in contrast, there is no evidence that Plaintiffs voluntarily requested the prepaid debit cards or showed any intention of entering into a bargain prior to card issuance. Additionally, Plaintiff has raised a dispute of material fact as to whether inmates received the card terms and conditions at issuance. Given this dispute, it is not clear that the Defendants made a sufficiently definite offer, such that Plaintiffs' subsequent use of the cards represented acceptance.[42]

Further, some class members may have incurred the $5.95 monthly maintenance fee without ever actually using the card. Even if that card use were assent to the card terms and conditions, class members who never used to card to withdraw money incurred this monthly fee through inaction. For these class members, there is no colorable argument that they have entered into a contract with Defendants.

ii. Conversion

Defendants contend that summary judgment is appropriate for Plaintiffs' conversion claim because a conversion claim does not lie where the claim is for a sum certain, as opposed to specific and identifiable monies.[43] Defendants argue that because the Plaintiffs' funds were held in the a pooled custodial account and were not sequestered, the funds at issue are not specific are not identifiable.

Plaintiffs have presented sufficient evidence for a jury to conclude that the allegedly converted funds are specific and identifiable. Under Ohio law, a claim for conversion may

---

[42] See *Gen. Motors Corp. v. Keener Motors, Inc.*, 194 F.2d 669, 675–76 (6th Cir. 1952) ("An offer must be so definite in its terms, or must require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain.").
[43] See *Carter v. PJS of Parma, Inc.*, No. 1:15 CV 1545, 2016 WL 1316354, at *2 (N.D. Ohio Apr. 4, 2016) (dismissing conversion claim brought by former servers because the allegedly converted tips were not specific and identifiable).

lie where the disputed funds are held in trust.[44] Here, record evidence shows that the Plaintiff's funds were kept in such a trust account.[45] Because of this trust arrangement, there is sufficient record evidence to show that correctional facilities had an obligation to return the specific funds surrendered on entry—not merely a certain amount of money—upon release.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss, and **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment.


Dated: January 8, 2019              *s/     James S. Gwin*
                                    JAMES S. GWIN
                                    UNITED STATES DISTRICT JUDGE

---

[44] *See Haul Transp. of VA, Inc. v. Morgan*, No. CA 14859, 1995 WL 328995, at *4 (Ohio Ct. App. June 2, 1995) (noting that a conversion claim would be valid if Defendant had held the funds "in trust or in some fiduciary capacity for [Plaintiff]").

[45] *See* Doc. 51-18 at 1. (explaining that inmate funds are deposited into an "inmate trust account" upon booking).